**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Nicole Brown,

        Plaintiff,

v.

State Farm Mutual Automobile Insurance Company,

        Defendant.

No. CV-24-00368-PHX-ROS

**ORDER**

Before the Court is Defendant's Motion for Summary Judgment (Doc. 47), to which Plaintiff filed a Response (Doc. 49), and Defendant filed a Reply (Doc. 51). Defendant's Motion will be decided without oral argument. *See* LRCiv 7.2(f).

For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment.

## I.    BACKGROUND

All facts set forth below are undisputed or not subject to reasonable dispute based on proffered admissible evidence unless otherwise noted.[1]

Plaintiff Nicole Brown, a Black woman, worked for Defendant State Farm Mutual Automobile Insurance Company from April 2003 to December 2023. (Doc. 49 at 4.) In 2012, Plaintiff was promoted to the position of Claims Team Manager ("TM") responsible

---

[1] Plaintiff's evidentiary objections are resolved *infra*. Notably, the series of complaints against Plaintiff are not hearsay because they are not offered for the truth of the matter asserted (i.e., that Plaintiff actually engaged in the accused conduct or behaviors). Rather, they are offered to show that the complaints were made and substantiated the others, which Plaintiff does not dispute.

for overseeing a team of Claims Specialists[2] (*Id.* ¶ 7.) Each TM reports to a Section Manager ("SM") who supervises a team of TMs. In turn, each SM reports to a Claims Manager ("CM").

On February 17, 2014, an internal investigation was initiated after two of Plaintiff's team members filed complaints "alleg[ing] Brown is condescending, disrespectful and is creating a hostile work environment." (Doc. 47-1 at 127.) Though the investigation did not definitively find Plaintiff violated State Farm's anti-harassment policy, it "did reveal concerns among several witnesses interviewed" regarding Plaintiff's "micromanaging, disrespect, condescending tone and [her] controlling nature." (*Id.* at 128.) Three of the four other team members interviewed for the investigation corroborated the allegations of the two complainants that "Brown is condescending, negative; controlling, abrupt, and a micromanager." (*Id.* at 129.) Plaintiff's then-SM, Rosalinda Hockman, also recalled "receiv[ing] a complaint from employees indicating Brown was condescending towards them" soon after Plaintiff became a TM. According to Hockman, "Brown was very receptive to [Hockman's] constructive feedback and made changes to her style." (*Id.*)

Between December 2020 and March 2021, multiple other employees made similar complaints about Plaintiff; an investigation found no clear violation of State Farm's policies but recommended Plaintiff be provided verbal coaching. (Doc. 47-1 at 137.)

In December 2022, Cindy Castillo-Wilson took over as Plaintiff's SM. (Doc. 47-1 at 78.) SM Castillo-Wilson reported to CM Conall Murphy, who was Ms. Brown's second-level supervisor from 2020 to September 2023.[3] (Doc. 49 at 4.) In turn, CM Murphy was directly supervised by Michael Payne, who took over as Vice President of Operations ("VPO") in late 2021. (*Id.* at 5.)

In January 2023, SM Castillo-Wilson received a complaint from Jessica Poppe, one

---

[2] Though some of Plaintiff's team members have titles such as "Claim Representative" and "Claim Processor," the Court refers to them generally as Plaintiff's "team members" or "subordinates."

[3] Paul Robichaux became Plaintiff's CM sometime in September 2023 and attended the misconduct review meeting where it was unanimously agreed Plaintiff should be demoted. However, CM Robichaux played little role in the alleged discrimination and retaliation because the ultimate decision-making authority was with CM Murphy and VPO Payne. (Doc. 49-1 at 147.)

- 2 -

of Plaintiff's team members. Poppe's allegations echoed prior concerns of Plaintiff's "actions and tone" making Poppe feel bullied, dismissed, and berated, and that Plaintiff did not "feel like a safe person" to communicate with. (Doc. 47 at 3.) After multiple other employees made similar complaints about Plaintiff in April 2023,[4] SM Castillo-Wilson contacted State Farm's Human Resources & Development Department ("HR&D") for advice on how to proceed.

On May 18, 2023, SM Castillo-Wilson met with Plaintiff to discuss the complaints against her and to provide verbal coaching regarding Plaintiff's responsibility as TM to create a safe working environment and how "to incorporate a more supportive, inclusive and caring style" in communicating with her team members. Castillo-Wilson did inform Plaintiff that "[f]ailure to demonstrate immediate, consistent, and sustained improvement may result in further action up to and including termination." During this meeting, Plaintiff alleges she told Castillo-Wilson she "was concerned these complaints related to [her] status as a [B]lack woman supervisor and are consistent with stereotypical complaints against [B]lack females in the workplace and the company's response to those complaints was influenced by [her] status as a [B]lack woman." (Doc. 49-1 at 37.) The next day, Plaintiff sent an email "rebuttal" to Castillo-Wilson's summary of their meeting, objecting to Plaintiff's subordinate's accounts of the various incidents in which Plaintiff was allegedly argumentative and bullying.

After her meeting with SM Castillo-Wilson, Plaintiff called HR&D and spoke with Carol Lee Nelson, stating Castillo-Wilson was "not being supportive" and that Plaintiff "thought that her leader was supporting [Plaintiff's] employees and not her." According to Plaintiff, she also shared with Nelson her concerns that her team member's complaints were racially biased.[5] Plaintiff did not request an investigation into her complaints about

[4] Plaintiff asserts, without evidence, that this "stream of complaints" was her team's "concerted effort to push back against her" because they were "frustrated" by her holding the team accountable. (Doc. 49 at 2.)

[5] Plaintiff generally asserts she "shared those same concerns Ms. Nelson" that she had shared with Castillo-Wilson. (Doc. 49-1 at 38.) Plaintiff's account is disputed by Nelson in her deposition testimony. In particular, Nelson disagrees that Plaintiff communicated "any concern that either her leader or her subordinate employees were treating her differently because of her race." (Doc. 47-1 at 176.) On May 19, 2023, Plaintiff sent an

Castillo-Wilson. A week later, Nelson reached back out to Plaintiff, asking how she might try to address Plaintiff's concerns, but Plaintiff told Nelson the matter concerning her complaints about Castillo-Wilson could be closed. (Doc. 49-1 at 38.) Ultimately, HR&D determined an investigation was not warranted and Plaintiff's complaints to Nelson did not constitute an alleged policy violation.

On May 26 and June 7, 2023, SM Castillo-Wilson held two more coaching sessions with Plaintiff to discuss her team members' complaints. On June 8, 2023, Castillo-Wilson sent Plaintiff an email recapping the prior day's meeting; Plaintiff responded to the email on June 9, objecting to "the misleading manner of the email," (Doc. 49-1 at 39), and asserting Plaintiff was "being held accountable to a different standard" than other TMs who were not similarly treated after allegedly being involved in "more egregious" situations, (Doc. 49-1 at 178).[6] That same day, Plaintiff again reached out to Nelson and asked to reopen and investigate Plaintiff's complaint against Castillo-Wilson.

Also on June 9, 2023, another complaint was filed concerning Plaintiff's negative interactions with her team members. As a consequence of the multiple similar complaints against Plaintiff in a relatively short time, HR&D decided to recommend a formal investigation into the complaints. On or about June 14, 2023, after SM Castillo-Wilson was notified of the new complaint and investigation by HR&D, she ceased any efforts to address the complaints herself and played no further role in the investigation regarding Plaintiff. (Doc. 47-1 at 70–74.)

The investigation was assigned to investigator Brenda Colon with State Farms's HR-Investigations ("HRI") team. Colon interviewed eleven of Plaintiff's current or former team members, most of whom corroborated the allegations concerning Plaintiff's behavior

email "rebuttal" to Castillo-Wilson's recap of their May 18 meeting in which Plaintiff referred to the complaints against her as "stereotypical." Although Plaintiff asked Nelson to review this (and other) emails she sent to Castillo-Wilson, there is no evidence Plaintiff told Nelson what she meant by "stereotypical," and Nelson testified she and Plaintiff did not discuss what this meant. (*See id.* at 179.)

[6] In her Declaration, Plaintiff characterizes her June 9 email as "pointing out how white managers with similar complaints had been treated differently and without repercussions for similar conduct." (Doc. 49-1 at 39.) But in the actual text of her email, Plaintiff did not mention race, stereotyping, or any other word explicitly or implicitly appearing to tie her alleged differential treatment to her race. (*See id.* at 178.)

and interactions with team members. (Doc. 47 at 5–6.) During Colon's investigation, another complaint was submitted by one of Plaintiff's subordinates; VPO Payne requested to meet with both Colon and the new complaining employee to discuss the complaint, and the employee reiterated much of what Colon allegedly had heard from the other employees. According to Colon's report of her investigation:

> The majority of witnesses interviewed, described their work environment as stressful[,] indicated that [Plaintiff's] behavior as a leader adds an additional layer of stress, anxiety, and fear many described as "hostile" and not fitting of a "servant leader." Several employees were hesitant to speak to HRI and expressed fear of retaliation.

(Doc. 47-1 at 227.)

On July 25, 2023, Colon interviewed Plaintiff, in the presence of CM Murphy and CM Vanessa Patricia Walters. Colon shared with Plaintiff the feedback gathered from her investigation and the interviews of Plaintiff's current and former subordinates. Plaintiff denied any wrongdoing, claiming the employees fabricated the allegations concerning her behavior to avoid being held accountable for their own shortcomings.[7] (Doc. 47-1 at 232.) In the interview, Plaintiff also shared her concerns that the complaints against her, as well as SM Castillo-Wilson's handling of those complaints, were racially biased, stating "[t]he only thing I'm guilty of is managing while Black." (*Id.*) After the interview, Colon discussed Plaintiff's allegations with CM Murphy and CM Walters, advising that in her opinion a separate, independent investigation was now necessary regarding Plaintiff's discrimination complaint.

On August 4, 2023, HRI investigator Cindy Smith was assigned to investigate Plaintiff's allegations of discrimination. As part of her investigation, Smith examined HR and management records and interviewed both SM Castillo-Wilson and Plaintiff. Plaintiff claimed there were multiple times non-Black TMs were treated more favorably by Castillo-Wilson for similar incidents, but provided only one specific incident in early 2023 involving TM Bobbie Wade. This incident, which Plaintiff had previously mentioned in

---

[7] Notably, Plaintiff presents apparently conflicting explanations for the allegations concerning her behavior. On the one hand, Plaintiff asserts the allegations are untrue; but alternatively, Plaintiff implicitly admits to some of the alleged behaviors by arguing other TMs who displayed such behaviors were not similarly investigated or demoted.

her June interview with Colon, occurred while Plaintiff was out of town and TM Wade assisted Plaintiff's team members as necessary. After one of Plaintiff's team members, Lisa Reynolds, made a mistake, Wade attempted to provide coaching; this prompted a negative reaction from Reynolds, which prompted Wade to angrily raise her voice in response. Despite this, SM Castillo-Wilson did not take further action against Wade because Wade allegedly self-reported the incident to Castillo-Wilson, acknowledged the impropriety of her response, discussed how she would approach the situation differently in the future, and had no prior history of complaints. After conducting multiple interviews and reviewing the relevant information, Smith completed a draft summary of her investigation findings on October 9, 2023, noting she found no evidence substantiating Plaintiff's allegations.

On September 12, 2023, Colon and VPO Payne met to discuss the findings of Colon's investigation. VPO Payne agreed with Colon's conclusion that there was sufficient evidence, corroborated by multiple witnesses, to establish Plaintiff violated State Farm's anti-harassment policy by creating "an uncomfortable and intimidating work environment for her team." (Doc. 47-1 at 227.) On September 20, 2023, Colon completed the first draft summary of her findings; on September 26, Colon then distributed the draft summary to VPO Payne and Plaintiff's new CM, Paul Robichaux,[8] in advance of a misconduct review meeting set for September 29, 2023, to determine what discipline, if any, should be administered.

Present at the September 29 misconduct review meeting were Colon, VPO Payne, CM Murphy, CM Robichaux, and HR&D manager Cami Hubert. The group discussed Colon's findings in comparison with discipline previously issued against other employees who committed similar policy violations. The misconduct review meeting unanimously concluded with the decision "that level reduction was the most appropriate course of action."[9] (Doc. 47-2 at 53–54.) VPO Payne claimed he and CM Murphy were ultimately

---

[8] Colon's email distributing the draft summary is not in evidence. However, in Robichaux's deposition, counsel referred to the exhibit having been sent "to Michael Payne and Paul Robichaux with several ccs." (Doc. 47-2 at 50.) The Court will assume the "several ccs" included the other individuals who attended the September 29 misconduct review meeting.

[9] The team considered the substantiated allegations and demotions in similar cases, along with other factors that favored demotion as the appropriate response. These factors

responsible for the decision to demote Plaintiff. (Doc. 49-1 at 147.)

Prior to the misconduct review meeting, on September 22, 2023, Plaintiff filed a charge of discrimination with the EEOC. The EEOC notified State Farm of Plaintiff's charge on October 1, 2023.[10] On October 13, 2023, CM Robichaux informed Plaintiff of her demotion as had been decided at the September 29 misconduct review meeting. Plaintiff notified State Farm on December 12, 2023, of her intent to terminate her employment, effective December 27, 2023.[11] Plaintiff thereafter filed a second charge with the EEOC on January 9, 2024, alleging she was constructively discharged in retaliation for engaging in protected activity. On January 18, 2024, the EEOC issued a notice of right to sue with respect to Plaintiff's charges of discrimination and retaliation.

## II.    LEGAL STANDARD

Summary judgment is granted if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. *Id*.

At summary judgment, the Court considers only admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(B). When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be

included: Plaintiff's history of being coached after complaints for similar behaviors; Plaintiff's lack of accountability and remorse; and management's lack of confidence in Plaintiff's ability to make the necessary behavioral adjustments to remain in a leadership position.
[10] October 1, 2023, was a Sunday, so State Farm did not receive effective notice of Plaintiff's EEOC Charge until October 2, 2023.
[11] Plaintiff asserts she told State Farm "her resignation would be effective at the conclusion of her paid time off . . . on February 2, 2024," but "State Farm preemptively made her employment termination effective December 27, 2023." (Doc. 1 ¶¶ 47–48.) However, Plaintiff does not suggest State Farm acted improperly in setting this effective termination date.

believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

### III.   ANALYSIS

#### A. Preliminary Objections

Plaintiff objects to the entirety of Defendant's asserted facts "on the basis that the evidence cited is inadmissible based on State Farm failed [sic] to comply with the Court's order . . . requiring each party to file a Rule 26(a)(3) disclosure by the December 13, 2024 deadline." Pretrial disclosures under Rule 26(a)(3) "must be made at least 30 days before trial" unless otherwise ordered by the Court. Fed. R. Civ. P. 26(a)(3). The original district judge hearing this matter issued a Case Management Order on April 22, 2024, setting the deadline for pretrial disclosures as December 13, 2024. (Doc. 14.) On December 31, 2024, the parties jointly moved to refer the case to a magistrate judge for a settlement conference, (Doc. 39), which was conducted on March 5, 2025 (Doc. 50). Although Defendant failed to file their pretrial disclosure by the original deadline of December 13, 2024, Plaintiff has failed to establish she suffered any prejudice as a result or why the draconian sanction of excluding *all* of Defendant's evidence is justifiable. *See* Fed. R. Civ. P. 37(c)(1) (excusing a failure to timely file pretrial disclosures if "substantially justified" or "harmless"). Indeed, the trial setting was delayed while the parties pursued a possible settlement, and Plaintiff does not suggest Defendant intends to rely on evidence that was not otherwise disclosed.

Plaintiff specifically objects to Defendant's account of an incident involving Lisa Reynolds and TM Bobbie Wade as inadmissible hearsay.[12] (*See* Doc. 49 at 3:19.) With respect to this incident, it is undisputed that Wade's conduct was wrongful and similar to the conduct of which Plaintiff was accused by her subordinates. But Defendant's account

---

[12] Notably, Plaintiff's own account of the Reynolds incident, which she offers to show Wade was similarly situated to Plaintiff, is itself likely based on inadmissible hearsay.

of the Reynolds incident is not hearsay because it is not offered to prove the truth of this account; rather, it is offered to show why "Castillo-Wilson did not take any further action regarding the incident." (*See* Doc. 47 at 8:18–19.) Although Plaintiff might dispute whether Wade in fact took responsibility for her actions, she cannot dispute Castillo-Wilson's reasoning and perception of the incident. Castillo-Wilson's reasons why she did not believe discipline was necessary for Wade are nonhearsay evidence relevant to whether Wade was similarly situated to Plaintiff.

As relevant to the Court's analysis, Plaintiff disputes the following facts from Defendant's Motion: (1) State Farm recommended "verbal coaching" after the February 2021 complaint (Doc. 47 at 2:28–3:1); (2) Nelson's account of whether Plaintiff alleged race-based discrimination against her team members and SM Castillo-Wilson (*id.* at 4:13–5:1); (3) "HR&D recommended Plaintiff be formally investigated for policy violations" (*id.* at 5:15); and (4) the "implied assertion that Mr. Murphy and Mr. Payne did not know about Ms. Brown's discrimination complaints" (Doc. 49 at 3:28–4:1).

First, there is no genuine dispute of material fact regarding State Farm's recommendation for verbal coaching of Plaintiff after the February 2021 complaint. Plaintiff proffers CM Murphy's deposition testimony to seemingly suggest verbal coaching was not warranted based only on the "Findings" section of the investigation summary. But significantly, Plaintiff does not dispute verbal coaching was the recommended action.

Second, there is no genuine dispute of material fact regarding Nelson's account of Plaintiff's allegations against SM Castillo-Wilson. Plaintiff points to her sworn declaration asserting she "shared those same concerns with Ms. Nelson and expressed [her] apprehension about Ms. Castillo-Wilson's follow-up/response." (Doc. 49-1 at 38.) Even if this general assertion was sufficient to dispute whether Plaintiff specifically alleged racial discrimination by her team members and SM Castillo-Wilson, this dispute is not material as Plaintiff has not proffered admissible evidence that Nelson relayed allegations of racial discrimination to anyone else, particularly the supervisors responsible for Plaintiff's demotion, VPO Payne and CM Murphy.

- 9 -

Third, it is true HR&D did not explicitly recommend Plaintiff be investigated "for policy violations," but it is otherwise undisputed HR&D relayed the complaints against Plaintiff to VPO Payne with a request "to investigate the concerns" raised by Plaintiff's subordinates. (Doc. 47-1 at 197.)

Lastly, Plaintiff disputes Defendant's factual statement that "[t]here is no evidence Plaintiff ever approached or raised any issue of discrimination or differential treatment with the managers to whom Castillo-Wilson reported at the time, Murphy and Michael Payne." But Plaintiff has not proffered admissible evidence to dispute this fact. Rather, Plaintiff argues that that either Castillo-Wilson[13] or Nelson must have relayed allegations of racial discrimination to Murphy and Payne. But this is nothing other than mere speculation.

**B. Race Discrimination**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" on account of the employee's race. 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment on a race discrimination claim, a plaintiff must "create a triable issue of fact regarding discriminatory intent." *Alozie v. Ariz. Bd. of Regents*, 431 F. Supp. 3d 1100, 1111 (D. Ariz. 2020) (quoting *Habib v. Matson Navigation Co.*, 694 F. App'x 499, 500–01 (9th Cir. 2017)). To meet this burden, a plaintiff may produce "direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the adverse action; alternatively, a plaintiff may rely on the *McDonnell Douglas* burden-shifting framework to raise a rebuttable presumption of discrimination.[14] *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013).

---

[13] Although SM Castillo-Wilson forwarded to Murphy Plaintiff's June 9 email, Plaintiff's references therein to the allegations being "stereotypical" are too general, without more, to establish Murphy understood Plaintiff to be alleging racial discrimination.
[14] The parties appear to agree *McDonnell Douglas* is the applicable framework here. In any event, because Defendant has proffered a legitimate, nondiscriminatory motivation, the *McDonnell Douglas* framework is appropriate: "Under either approach, [Plaintiff] must produce some evidence suggesting" an adverse employment action "was due in part or whole to discriminatory intent." *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004).

To establish a prima facie case under *McDonnell Douglas*, Plaintiff must show: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802)). "If the employer does so, [Plaintiff] must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 1124 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

It is undisputed Plaintiff belongs to a protected class[15] and was subject to an adverse employment action when she was demoted.[16] (*See* Doc. 47 at 14.) However, Defendant argues Plaintiff "cannot show (1) she was performing her job satisfactorily [i.e., she was qualified for her position] or (2) that similarly situated individuals outside her protected class were treated more favorably." (*Id.*) Furthermore, even if Plaintiff established her prima facie case, Defendant argues there is no evidence of intentional discrimination to suggest Defendant's proffered legitimate motive is pretextual. (*Id.* at 22–25.)

### 1. Satisfactory Job Performance

Plaintiff has met her prima facie burden to show a genuine dispute as to her qualifications for the TM position from which she was demoted. Despite some prior history of similar complaints, Plaintiff has also shown her history of favorable performance

---

[15] Plaintiff alleges she suffered discrimination rooted in stereotypical tropes regarding Black women. (Doc. 1 ¶¶ 41–42.) However, Plaintiff states a claim only for race-based, not sex-based, discrimination. (*Id.* ¶ 54.)

[16] In her Complaint, Plaintiff alleges she suffered multiple adverse employment actions, including failures to promote her. However, the Court considers Plaintiff's demotion to be the particular action on which she states her claim, as Plaintiff has not argued nor proffered evidence as to the others. For example, when relying on *McDonnell Douglas* for a failure to promote claim, Plaintiff must show the job remained open or a non-Black individual was promoted in her place.

reviews and merit pay increases. (Doc. 49 at 23.) Defendant argues that Plaintiff's soft skills regarding positive interactions with her team members are also important qualifications for a TM and that her subordinates' complaints show Plaintiff's qualifications were lacking in this respect. (*See* Doc. 51 at 9.) But Plaintiff's alleged "deficiencies in fostering a positive environment," (*id.*), also constitute Defendant's legitimate nondiscriminatory reason for demoting Plaintiff, so Defendant's argument is more properly resolved at the pretext stage. *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) ("[B]y requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action—in other words, to prove pretext and the ultimate issue of intentional discrimination. The prima facie burden is not so onerous."); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1126–27 (C.D. Cal. 2007); *see also Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002) (finding a district court erred by requiring a plaintiff to show not only he was qualified but "he was doing his job well enough to eliminate the possibility that he was laid off for inadequate job performance," thus "conflat[ing] the minimal inference needed to establish a prima facie case with the specific, substantial showing [the plaintiff] must make at the third stage of the *McDonnell Douglas* inquiry to demonstrate that [the defendant's] reasons for laying him off were pretextual").

## 2. Similarly Situated Comparators

However, Plaintiff has failed to show similarly situated, non-Black employees were treated more favorably. To establish similarly situated comparators, the individuals being compared "need not be identical" but must be "similar 'in all material respects.'" *Ballou v. McElvain*, 29 F.4th 413, 423 (9th Cir. 2022) (quoting *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010)). Plaintiff asserts she has "provided the examples of several non-[B]lack managers, who suffered no repercussions in response to complaints like those levied against her: Amanda Alieto, Bobbie Wade, Stephanie Logan, Crystal Huggins, and Linda Osborn-Jackson." (Doc. 49 at 24.) But as to all but one of these

individuals, Plaintiff has no evidence supporting her contentions beyond her own testimony, which relies on unsubstantiated and inadmissible hearsay.[17] (*See* Doc. 49-2 at 140–41, 144–46). Only as to TM Bobbie Wade does Plaintiff offer specific facts as to how Wade was not similarly punished in response to a similar complaint regarding an interaction with a subordinate. But the record is also clear Plaintiff and Wade were not similarly situated—unlike with Plaintiff, there is no admissible evidence offered by Plaintiff that Wade had a similar history of receiving such complaints, (*see* Doc. 47 at 20), and there is undisputed admissible evidence that Wade self-reported the incident to SM Castillo-Wilson while appearing to take responsibility and explaining future steps she would take to avoid similar incidents in the future, (Doc. 47-1 at 213–16). Thus, the incident with Wade is materially different such that it cannot support an inference Plaintiff was treated more harshly for the same conduct simply because of her race.

### 3. Pretext

Because Plaintiff has not met her prima facie burden, the *McDonnell Douglas* analysis ends. But even assuming Plaintiff had sufficient evidence of comparators, Defendant has proffered a legitimate, nondiscriminatory reason for Plaintiff's demotion based on ongoing corroborated complaints concerning her behavior for which verbal coaching failed to resolve. Plaintiff would thus bear the burden to show Defendant's legitimate reason is pretextual.

Under Title VII, "a plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action" or by "relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006). When relying on indirect, circumstantial evidence to show pretext,[18] "that evidence must be specific and

---

[17] Even if Plaintiff's evidence was admissible, her comparisons are too general to assess whether these individuals were similar in all material respects.

[18] Here, Plaintiff has no direct evidence of discriminatory intent. "Direct evidence is 'evidence which, if believed, proves the fact of [discriminatory animus] without inference or presumption." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003). Even if Plaintiff's assertions of "stereotypical" language qualifies as circumstantial evidence

substantial to defeat the employer's motion for summary judgment." *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005)). This "specific and substantial" standard, however, "is tempered by [the Ninth Circuit's] observation that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015).

In her Response, Plaintiff asserts she has provided sufficient evidence for a jury to find Defendant's asserted motive is pretextual "under a cat's paw theory." (Doc. 49 at 24.) Under the "cat's paw" or "rubber stamp" theory of liability, a "subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process." *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007). Here, Plaintiff argues the alleged bias of her subordinates and/or SM Castillo-Wilson is imputed to Defendant given its "notice of the discriminatory motives of the subordinates making complaints against [Plaintiff], the inherently discriminatory nature of the complaints, and the obvious intent of the subordinates to get rid of [Plaintiff]." (Doc. 49 at 24.) But regardless of whether and when CM Murphy and VPO Payne knew Plaintiff had complained of racial discrimination, Plaintiff's argument fails for two reasons.

First, Plaintiff has not proffered specific and substantial admissible evidence showing any biased subordinate influenced or was involved in the otherwise independent decisions to investigate and demote her. Plaintiff asserts "State Farm essentially rubber stamped those complaints and took the action the subordinates wanted." (Doc. 49 at 24.) But even if Plaintiff could show her subordinates' complaints were motivated by discriminatory animus,[19] Plaintiff does not offer admissible evidence that Defendant

---

from which a jury could infer her subordinates' complaints were discriminatory, Plaintiff must also show a sufficient nexus between her subordinates' discriminatory complaints and the ultimate decision to demote her. *See id.* ("Vasquez has not shown the necessary nexus because Leeds conducted her own thorough investigation, and . . . Vasquez presents no evidence that discriminatory animus motivated Leeds' decision.").

[19] Given the numerous complaints filed by Plaintiff's subordinates, Plaintiff would

"rubber stamped" those complaints without independent review and demoted Plaintiff simply because her subordinates wished it. *See Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 807 (9th Cir. 2009) ("The facts before us here show a workplace in which the initial report of possible employee misconduct came from a presumably biased supervisor, but whose subsequent involvement in the disciplinary process was so minimal as to negate any inference that the investigation and final termination decision were made other than independently and without bias.") Her claim is pure speculation, which is insufficient to survive a motion for summary judgment.

Second, Plaintiff has not proffered specific and substantial admissible evidence upon which a jury could find the complaints of Plaintiff's subordinates were motivated by discriminatory animus.[20] In her deposition, Plaintiff affirmed the only evidence she has of her subordinates' race-based discrimination is "the terminology that was used to describe [her]." (Doc. 47-1 at 60.) Specifically, Plaintiff asserts complaints of her being "loud, aggressive, [and] yelling" is terminology rooted in a "a stereotypical trope of the 'angry [B]lack woman' that pervades our culture." (Doc. 49 at 9–10.) But without relevant evidence, these facially race-neutral words are not sufficient to raise an inference of discriminatory motive. *See, e.g.*, *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) ("Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker."); *Kimble v. Quality Assist, Inc.*, No. 1:19-cv-02549-JPB, 2022 WL 832424, at *9 (N.D. Ga. Mar. 21, 2022) ("[T]he Court is not persuaded that being overly critical of Kimble and referring to Kimble as 'angry' or the like, without more, support an inference of discrimination. Indeed, the plaintiffs in almost all of the cases Kimble cites to bolster her argument regarding racial stereotyping were expressly labeled as 'angry black women.'"); *Cromity v. City of Orlando*, 702 F. Supp. 3d 1223, 1239 (M.D.

seemingly need to show either (1) *every* complaint was racially biased, or (2) the nonbiased complaints alone were insufficient to provide a legitimate, nondiscriminatory basis for the investigation and demotion. *See Lakeside-Scott*, 556 F.3d at 808–09 (finding a supervisor's "wholly independent decisionmaking negated any causal connection" to another's bias where the investigation did not "depend heavily" on the biased individual); *Cromity*, 702 F. Supp. 3d at 1242 & n.29.

[20] Notably, Defendant devoted a significant portion of the Motion for Summary Judgment to this argument, (*see* Doc. 47 at 16–19), but Plaintiff does not address it in her Response.

Fla. 2023) (same).

Moreover, Plaintiff's asserted personal knowledge or belief that such words are "commonly used against [B]lack women in leadership positions" is not admissible to establish these facially neutral words are circumstantial evidence of another's discriminatory animus.[21] The Federal Rules of Evidence clearly distinguish between lay opinion testimony under Rule 701 and expert opinion testimony under Rule 702. Because Plaintiff has not sought to qualify herself as an expert witness, her opinion testimony must meet the elements of admissibility under Rule 701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Plaintiff's opinion that she "reasonably believed the attacks on her were discriminatory" based on perceived stereotypes against Black women in the workplace, (Doc. 49 at 9–10), may be rationally based on Plaintiff's own perception. *But see United States v. Gadson*, 763 F.3d 1189, 1207 (9th Cir. 2014) (noting lay testimony was not rationally based on a witness's perception where the witness "essentially 'spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury, interpreting even ordinary English language'" (quoting *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013))). However, this opinion would not be relevant to establish racially discriminatory intent because it is speculative in that it does not, without more, tie the stereotypical biases to Plaintiff's subordinates or anyone else at State Farm. *See, e.g.*, *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir.1999) ("[F]eelings and perceptions of being discriminated against are not evidence of discrimination."); *Humphries v. City Univ. of New York*, No. 13 CIV. 2641 PAE, 2013 WL 6196561, at *9 (S.D.N.Y. Nov. 26, 2013) ("Although use of the above adjectives to describe an employee could, in

---

[21] Plaintiff has also submitted two facially inadmissible articles concerning the "Angry Black Woman" stereotype. (Doc. 49-2 at 153, 162.) Even if these articles were admissible, they are likely not relevant as they might only suggest Plaintiff's subordinates or supervisors were *implicitly* biased, rather than acting out of discriminatory animus.

combination with other concrete factual allegations, support a claim of racial and/or gender discrimination, here there are no such allegations. Without more, Humphries' subjective interpretation of her co-workers' use of these critical but facially non-discriminatory terms does not, itself, reveal discriminatory animus.").

If Plaintiff's opinion is instead that, based upon her particularized experience as a Black woman and specialized knowledge of implicit biases against Black women in the workplace, her subordinates' facially race-neutral words establish they acted with a discriminatory motive, this may involve "specialized knowledge" within the scope of expert opinions under Rule 702. *See United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (law enforcement agents could testify that the defendant was acting suspiciously, without being qualified as experts; however, the rules on experts were applicable where the agents testified on the basis of extensive experience that the defendant was using code words to refer to drug quantities and prices); *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1245 (9th Cir. 2021) (Miller, J., concurring) ("In other contexts, we have held that an *expert's* observations on a psychological phenomenon explaining a class of behavior can be admitted to assist the jury." (emphasis added)). Assuming Plaintiff is qualified as an expert witness based on her gender, race, and lived experience, and even if her opinion regarding implicit biases is undisputed, it does not constitute admissible evidence of *intentional* discrimination by her subordinates. *See White v. BNSF Ry. Co.*, 726 F. App'x 603, 604 (9th Cir. 2018) (affirming a district court's exclusion of expert testimony on implicit biases because the plaintiff "never explained how testimony regarding implicit bias would be helpful to the jury in a disparate treatment case requiring evidence of intentional discrimination").

## C. Retaliation

The *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims. *Cornwell*, 439 F.3d at 1035 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). "To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between

the protected activity and the adverse employment action." *Id.* at 1034–35 (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994)). If the employer proffers a legitimate, nonretaliatory reason for its action, the plaintiff must then show the articulated reason is pretextual because it is unworthy of credence or because a retaliatory reason more likely than not motivated the action. *Yartzoff*, 809 F.2d at 1377.

It is undisputed Plaintiff's EEOC charge is protected activity[22] and Plaintiff's investigation[23] and demotion were adverse employment actions. But Defendant argues the admissible evidence establishes the decision to demote Plaintiff was made before anyone at State Farm knew Plaintiff filed an EEOC charge, and Plaintiff has not met her burden to produce admissible evidence establishing a causal link between the protected activity and adverse employment action. (Doc. 47 at 20.)

Plaintiff has likely met her prima facie burden to show a causal link between her protected activity and her investigation and demotion. A plaintiff may establish causation with "circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). Here, there is no causal nexus between Plaintiff's EEOC charge and her investigation and demotion because the decisions to investigate and demote Plaintiff were made before State Farm received notice of her EEOC charge. However, if Plaintiff's May 2023 internal complaint is instead viewed as the relevant protected activity, the initiation of an investigation roughly one month later might be sufficient circumstantial evidence to show causation.

But even assuming Plaintiff has made a prima facie showing of causation, she has

---

[22] Plaintiff alternatively argues her internal complaint regarding the "stereotypical" allegations against her was also protected activity, but there are disputes as to who in fact understood her complaint to be alleging race-based discrimination. Drawing every inference in Plaintiff's favor, the Court presumes this internal complaint qualifies as a second instance of protected activity

[23] Defendant asserts only an *unwarranted* investigation may sometimes qualify as an adverse employment action, citing for comparison *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003), and *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004). Following Ninth Circuit precedent, the Court presumes this is such a case where "merely investigating an employee—regardless of the outcome of that investigation—likely can support a claim for Title VII retaliation." *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018).

- 18 -

failed to create a triable issue rebutting Defendant's proffered legitimate reasons for investigating and demoting Plaintiff. Plaintiff asserts four grounds[24] to establish pretext: (1) the asserted basis for Plaintiff's investigation and demotion only warranted verbal coaching prior to her protected activity; (2) Plaintiff received positive performance feedback prior to the protected activity; (3) "Mr. Payne's initial response to the protected activity—criticizing Ms. Brown [sic] complaints as deflections of responsibility"; and (4) Defendant's inconsistent application of its own policies and practices. (Doc. 49 at 20–23.)

As to the first and second grounds, neither suggests Defendant's legitimate reason to demote Plaintiff is unworthy of credence as both are consistent with Defendant's proffered motivation. In light of Plaintiff's generally positive performance record in the past, prior isolated complaints regarding her behavior were found to only warrant verbal coaching. But as similar complaints continued to accrue against Plaintiff, according to Defendant it became apparent verbal coaching may not be sufficient to resolve the issue. Simply because a full investigation and demotion was not warranted for each discrete complaint does not suggest a full investigation and demotion was not warranted by the unceasing cumulative effect of the complaints.[25]

Third, the record does not support Plaintiff's characterization of Payne's June 20 response to her complaint against SM Castillo-Wilson. As a threshold matter, it's not clear this response is properly attributable to Payne or if it amounts to more than a factual statement on the meeting's circumstances. The record of the meeting merely notes:

[24] In her Response, Plaintiff relies on the temporal proximity only to show causation, not pretext. (*See* Doc. 49 at 20–21.) In any event, the temporal proximity is likely sufficient only to meet Plaintiff's minimal prima facie burden and does little to refute Defendant's proffered legitimate reason for her investigation and demotion. *See Kama v. Mayorkas*, 107 F.4th 1054, 1060–61 (9th Cir. 2024) (noting cases where temporal proximity was sufficient to show pretext involved a period of "only a few days" between the protected activity and adverse action, while usually being accompanied by other evidence of pretext); *Hashimoto v. Dalton*, 118 F.3d 671, 679–80 (9th Cir. 1997) (proximity of "a few months" sufficient to infer causation but not to show pretext); *see also Justice v. Rockwell Collins, Inc.*, 117 F. Supp. 3d 1119, 1141 (D. Or. 2015), *aff'd*, 720 F. App'x 365 (9th Cir. 2017) (finding proximity in time categorically insufficient to show pretext).
[25] It is for this reason the complaints themselves are not hearsay, as it is irrelevant whether Plaintiff in fact displayed the behaviors of which she was accused. Rather, the complaints are offered to suggest State Farm reasonably investigated and believed demotion was appropriate based on the number of complaints, their corroboration and substantiation, and because less drastic action had not been effective in stopping new complaints.

"[Payne] stated that Cindy has been a SM for a long time; none of that has been said about her before. And now have allegations that are deflecting to Cindy." (Doc. 49-1 at 57.) Furthermore, the record does not suggest anyone in this meeting knew or should have known Plaintiff's complaint against SM Castillo-Wilson involved allegations of racial discrimination. Plaintiff generally asserts after her May 18 meeting with Castillo-Wilson where she objected to the complaints against her, Plaintiff then "shared those same concerns with Ms. Nelson and expressed [her] apprehension about Ms. Castillo-Wilson's follow-up/response." (Doc. 49-1 at 38.) But in her deposition, Nelson testified Plaintiff never raised any concerns she was being treated differently because of her race. (Doc. 47-1 at 176–79.) And the report of the June 20 meeting does not suggest anyone involved understood Plaintiff to be asserting race-based discrimination, instead describing Plaintiff's allegations to concern "feeling unsafe, unsupported, harassed, and asked to do things that others are not being asked." (Doc. 49-1 at 57.) Thus, even if Payne was not sympathetic to Plaintiff's complaint, Plaintiff does not have sufficient evidence suggesting Payne had any reason to believe these complaints alleged race-based discrimination and thus constituted a protected activity.

Fourth, Plaintiff's assertions that Defendant deviated from its standard practices are largely meritless. A deviation from an employer's standard disciplinary process may serve as circumstantial evidence of pretext. *See, e.g.*, *Vasquez v. City of Idaho Falls*, 778 F. App'x 415, 417 (9th Cir. 2019) (noting such deviation where an employer "immediately disciplined [the employee] while refusing to explain the reason, failed to follow its progressive disciplinary process, and denied [the employee] access to the personal belongings he kept at work"); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 896 (9th Cir. 2005). Plaintiff argues Defendant's investigation process deviated from its own practices in four ways: (1) Payne "insisted on a full HR&D investigation" despite the typical progressive discipline structure; (2) the failure to afford Plaintiff's complaints against her subordinates and SM Castillo-Wilson "a second independent investigation free from influence by the first"; (3) the failure to "ignor[e] a complaining party's disciplinary

history"; (4) not pausing the first investigation into Plaintiff while Plaintiff's own complaints were being investigated. (Doc. 49 at 22–23.) But the record does not support Plaintiff's assertions:

(1) Plaintiff's evidence does not suggest Payne ignored the progressive discipline structure and "insisted on a full HR&D investigation." Rather, the report of the June 20 meeting shows Payne declined performing another environmental scan of Plaintiff's employees as they'd previously done, instead "asking if we need to now do something different." (Doc. 49-1 at 57.)

(2) The record shows Plaintiff's complaints were, in fact, afforded a second investigation independent of the investigation into the complaints of Plaintiff's subordinates. It may be true that two investigators, Smith and Colon, made contact four times over a five-week period. (*See* Doc. 49 at 16–17.) But according to Smith, some contact and information-sharing between the two investigations would not be inconsistent with State Farm's standard practices, (*see* Doc. 49-1 at 243), and there is no evidence suggesting these few contacts somehow tainted the independence of the investigations.

(3) Plaintiff fails to point to the record where this policy is noted, only noting Colon had never before encountered a situation where the complaining party's disciplinary history was relevant to an investigation. But assuming such a policy exists, Plaintiff's complaints concerned other complaints made against her, thus making similar past allegations of her behavior directly relevant to her claims that the allegations against her were fabricated.

(4) Again, Plaintiff fails to point to the record where Colon suggested the first investigation be paused pending the investigation into Plaintiff's complaint. (*See* Doc. 49 at 23.) Presumably, Plaintiff refers to a portion of Colon's deposition testimony wherein Colon explained that, after Smith initiated her investigation, Colon told VPO Payne she "cannot close [her] investigative file nor can you move forward and make any business decision pertaining to the outcome of

[Colon's] investigation until Cindy Smith has an opportunity" to investigate Plaintiff's complaints. (Doc. 49-1 at 200.) That appears to be what happened here: Smith distributed her investigation findings on October 9, 2023, after which CM Robichaux formally informed Plaintiff of her demotion on October 13, 2023. It is true that the disciplinary response to Colon's findings was agreed upon prior to the conclusion of Smith's investigation. But the timing of Robichaux's disciplinary notice suggests State Farm in fact waited for Smith to conclude her investigation before formalizing the decision to demote Plaintiff. Thus, Plaintiff's argument does little to show Defendant's reasons for demoting her were pretextual, as there is no evidence to suggest Defendant would have been unable or unwilling to reconsider Plaintiff's demotion if Smith's investigation had instead substantiated Plaintiff's discrimination complaints.

Overall, there is a more fundamental reason Plaintiff cannot show Defendant's proffered explanation is unworthy of credence—Plaintiff does not clearly dispute the behaviors of which she was accused, but rather she argues she was treated more harshly by her subordinates and supervisors for these behaviors on account of her race. Indeed, Plaintiff does not refute Defendant's legitimate belief that "it had to investigate, and could not ignore, the credible allegations of misconduct against her . . . accusations which, it turns out, were found largely to be true." *See Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1023 (9th Cir. 2018). And even if the complaints were false, Plaintiff has no evidence showing anyone at State Farm involved in the decision to demote her did not honestly believe demotion was warranted by the numerous complaints regarding Plaintiff's behavior, even if prior isolated complaints of such behavior were not previously found to substantiate policy violations. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("In judging whether Aloha's proffered justifications were 'false,' it is not important whether they were *objectively* false . . . . Rather, courts 'only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.'" (quoting *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir.

- 22 -

2001))). Defendants argue, and the Court agrees, "[e]ven if Plaintiff could conclusively prove she had not engaged in the behaviors complained of by her employees . . . , she would still fail to establish pretext because she has failed to produce any evidence that State Farm's justification that Plaintiff engaged in harassment was unworthy of belief." (Doc. 51 at 9.)

## IV. CONCLUSION

Based on the foregoing, Plaintiff has failed to show genuine issues of material fact exist as to both her discrimination and retaliation claims under Title VII. As such, the Court will grant Defendant's Motion for Summary Judgment in its entirety.

Accordingly,

**IT IS ORDERED** Defendant's Motion for Summary Judgment (Doc. 47) is **GRANTED.** The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

Dated this 19th day of March, 2026.

Honorable Roslyn O. Silver
Senior United States District Judge